*EXHIBIT C*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

Case No. 1:18-cv-21618-DPG

HOMESTEAD HOSPITAL, INC., WEST
KENDALL BAPTIST HOSPITAL, INC.,
BAPTIST HOSPITAL OF MIAMI, INC.,
SOUTH MIAMI HOSPITAL, INC., BHS
AMBULATORY SURGERY CENTER
AT BAPTIST, LTD. D/B/A MEDICAL
ARTS SURGERY CENTER,

Plaintiffs,

v.

GROUP & PENSION
ADMINISTRATORS,
INC.,

Defendant.
_____/

## AFFIDAVIT OF ERIC SHATANOF

STATE OF FLORIDA    )
                    )
COUNTY OF MIAMI-DADE )

BEFORE ME, the undersigned authority personally appeared Eric D. Shatanof, being over the age of eighteen (18) years, under oath, deposes and says:

1. I am the Corporate Vice President of Managed Care and Network Development for Baptist Health South Florida, Inc. ("Baptist Health"). As such, I oversee the contracting of the various provider facilities within the Baptist Health system, including Homestead Hospital, Inc., West Kendall Baptist Hospital, Inc., Baptist Hospital of Miami, Inc., South Miami Hospital, Inc., and BHS Ambulatory Surgery Center at Baptist, Ltd. d/b/a Medical Arts Surgery Center (the "Baptist Health Entities" or the "Hospitals"). I have been in this position for more than the past 13 years. I have been employed by Baptist for more than

the past 25 years and have been involved in the contracting with third party payors during that entire time.

2. Group & Pension Administrators, Inc. has requested documents reflecting the Baptist Health Entities' actual cost to provide the goods and services, including records as to the purchase of various medical supplies and "tangible items" listed on the invoices at issue in this case. The Baptist Health Entities collectively purchase these items in bulk and on a periodic basis. It would be extremely time consuming, if not impossible, to sort through these purchases in order to identify the source of each item listed on the subject medical bills. For example, if a patient was provided an aspirin during the course of his visit at one of the Hospitals, it would be nearly, if not utterly, impossible to identify when, and from which vendor, the Hospital purchased that specific aspirin. Even if such purchases could be identified, the amounts and details of such purchases are proprietary to the Baptist Health Entities. Moreover, the Baptist Health Entities derive independent economic value, actual or potential, from not disclosing the details of the costs of the Baptist Health Entities and other payors and/or providers would obtain economic value from gaining disclosure of the details of the costs of the Baptist Health Entities. Specifically, if other providers who compete with the Baptist Health Entities in the marketplace gained access to this information, they could use it to harm the Baptist Health Entities' interests and put the Baptist Health Entities at a competitive disadvantage.

3. The Baptist Health Entities each maintain a "chargemaster" listing the prices that they charge for various services that they provide. The methodology used to set the chargemaster prices are closely guarded trade secrets of the Hospitals because the Baptist

Health Entities derive independent economic value, actual or potential, from not disclosing the details of their price methodologies and other payors and/or providers would obtain economic value from gaining disclosure of the details of their price methodologies. The chargemasters consist of massive amounts of data and are updated and reviewed on a continual basis. It is industry standard for hospitals to bill for their services using the rates set forth in the chargemasters. These chargemasters are reviewed on a regular basis and benchmarked against the rates of other acute care hospitals in the community. The Hospitals' chargemaster rates are applied uniformly across the board to all patients in order to establish the charge for services rendered. The actual chargemaster prices at issue in this case already are set forth on the bills at issue that have been produced to Administrator. However, the formulas, criteria and methodologies used to develop the pricing of the Baptist Health Entities is a critically sensitive trade secret. Administrator can attempt to prove its case through expert witnesses without invading the Hospitals' trade secrets because expert witnesses have access to industry data, including the costs, rates, charges and receipts of other area hospitals and other publicly available information concerning the reasonableness of the charges at issue.

4. In creating and maintaining the chargemasters, the Baptist Health Entities have an entire department that creates a multitude of records. These records are proprietary and closely guarded trade secrets of the Hospitals.

5. The Baptist Health Entities maintain agreements with certain third-party payors. Where such agreements exist, the agreements set forth various methodologies through which the third-party payors agree to pay the Hospitals. In most cases, the reimbursement rates set forth in the agreements are a complex mix of various factors including per diem, per case,

percentage of charge and combinations thereof. Per diem rates are usually a set rate per day for inpatient admission that may have different rates for medical/surgical, ICU/CCU, NICU, sick babies, well babies and OB. Per case rates, where applicable, are usually a fixed rate for a certain procedure. Both per diem and per case rates also contain stop loss provisions that revert to a percentage of charge after certain levels of charges are reached. Percentage of charge rates usually simply discount the chargemaster rate by a certain percentage or percentages.

6. In many instances, the calculation takes into account factors other than the cost of providing services to any one patient. In negotiating these contracts with third party payors, many factors are taken into account including, among others, type of products offered by payor, whether the payor has "in" or "out-of-network" benefits, whether the payor has primary care gatekeepers and the product type. Thus, the amounts received based on negotiated discounts often involve factors having no bearing on the usual and customary charges, including all of these factors as well as the prompt payment of claims, the preferred provider relationship status and, as to international and individual self-pay patients, the ability of the patient to make payment.

7. The Baptist Health Entities derive independent economic value, actual or potential, from not disclosing the details of these agreements. Other payors would obtain economic value from gaining disclosure of the details of the agreements. The payment mix received by the Baptist Health Entities is critical to their survival as they lose money on governmentally imposed payments like Medicare and Medicaid as well as by treating uninsured who are unable to pay at all, which patients they are obligated by law to treat regardless of their ability to pay. Disclosure of the amounts received by the Baptist

      Health Entities under negotiated contractual discounts with those payors that negotiate such discounts in advance would compromise the Baptist Health Entities negotiations with other payors and threaten their very existence.

8. The specific details of these agreements are very closely guarded trade secrets of the Hospitals. The agreements contain confidentiality provisions that prohibit disclosure of the agreements. The agreements themselves are maintained under lock and key and stored in a limited access managed care directory.

9. From 2016 through March 2018, the Baptist Health Entities and their affiliates collectively have provided services to more than approximately 2,400,000 patients and billed more than approximately $21,500,000,000 on a gross basis. To sort through all of these visits to identify those where "services similar to those that are subject of this action" were provided would be extremely time consuming if not impossible. The sheer volume of documents and information that would have to be sorted through would probably take a team of experts working around the clock for several months, if it could even be done at all.

10. Even if such cases could be identified, it is extremely unlikely that the services would be "similar" enough to enable a meaningful comparison. In such instances, it is impossible to determine how to prorate any partial payment received against the different groups of services provided. To the extent that it is not completely impossible to do so, this process would take a second team of experts substantial time to attempt. For instance, if a patient came to the hospital and had a single MRI, that case could, in theory, be compared to all other cases where a patient came in and had a single MRI. However, in reality most patients have a multitude of services provided. Group & Pension Administrators, Inc.

would have the Hospitals search through an enormous amount of records to try to locate other patients that had "similar services" provided. Assuming, for the sake of argument, that such search revealed cases where some of the same services were provided but other services not similar also were provided and partial payment was received, it would be challenging to determine how much of the partial payment was toward the "similar" services and which part of the partial payment was toward the services not "similar."

FURTHER AFFIANT SAYETH NAUGHT

_____
ERIC D. SHATANOF

I HEREBY CERTIFY that, this 17 day of July, 2018, before me personally appeared Eric D. Shatanof (✓) who is personally known to me or ( ) who produced _____ for identification and who ( ) did ( ) did not take an oath and who states that all facts set forth in this Affidavit are true and correct to the best of his knowledge and belief.

_____
Notary Public, State of Florida

Lourdes Haydar
Printed Name of Notary Public

My Commission Expires:

> LOURDES HAYDAR
> Notary Public - State of Florida
> Commission # GG 204080
> My Comm. Expires Jul 28, 2022
> Bonded through National Notary Assn.